**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| MEGAN MCDANIEL, | |
| Plaintiff, | Civil Action No.: CV 225-143 |
| v. | |
| REPUBLIC SERVICES OF GEORGIA LP, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Megan McDaniel and brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Plaintiff alleges that Defendant Republic Service Services of Georgia LP subjected Plaintiff to discrimination based on her sex, including by subjecting Plaintiff to a hostile work environment due to the same, and further retaliated against Plaintiff after she engaged in protected activities, resulting in the constructive termination of Plaintiff's employment, respectfully showing as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331, 1343, & 1391 and the enforcement provisions of Title VII of the Civil Rights Act of 1964.

2.

Venue is proper in this judicial district and the division of this Court because the events underlying this action, occurred in Glynn County, Georgia, which is located in this judicial district and division, pursuant to 28 U.S.C. § 1391, 42 U.S.C. § 2000e-5(f)(3), and the Rules of this Court.

1

**PARTIES**

3.

Plaintiff Megan McDaniel (hereinafter, "Plaintiff" or "Ms. McDaniel") is a citizen of the United States and a resident of the State of Georgia.

4.

At all times relevant times, Ms. McDaniel was considered a covered, non-exempt employee under Title VII of the Civil Rights Act.

5.

Defendant Republic Services of Georgia LP (hereinafter, "Defendant" or "Republic") is a foreign limited partnership formed under the laws of the State of Delaware, with its principal place of business located at 18500 North Allied Way, Pheonix, Arizona 85054. Defendant may be served with process by delivering a copy of the Summons and Complaint to its Registered Agent, The Corporation Company, located at 410 Peachtree Parkway, Suite 4245, Cumming, Forsyth County, Georgia 30041.

6.

Defendant is a subsidiary of Republic Services, Inc., a publicly traded waste services company that provides non-hazardous solid waste collection, waste transfer, waste disposal, recycling, and energy services. Republic Services, Inc. and its subsidiaries, including Defendant, are the second largest provider of such services in the United States. Defendant does business as "Republic."

7.

Defendant is engaged in interstate commerce, has annual revenue of well in excess of $500,000.00, and has employed in excess of 500 individuals in the year 2024 and in prior calendar years.

8.

At all relevant times, Defendant was considered a covered employer under Title VII of the Civil Rights Act of 1964 (hereinafter, "Title VII").

## STATEMENT OF FACTS

9.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 8, as if the same were set forth herein.

10.

In or around May 2023, Ms. McDaniel began her employment with Defendant at its Brunswick, Georgia location.

11.

Ms. McDaniel was excited about this job with Defendant, particularly because she was a welding school student, and this would be the first job in welding.

12.

According to the Bureau of Labor Statistics (2023), women make up only 5.8% of workers in the welding, soldering, and brazing fields in the United States.

13.

Indeed, during Ms. McDaniel's tenure, Defendant did not employ any other female welders, leads, or supervisors, at its Brunswick, Georgia location.  The few other females employed by Defendant were primarily drivers.

14.

Defendant assigned Ms. McDaniel to work on a five-person welding team where she was the only female in the group.  The team's supervisor was also male.

15.

Ms. McDaniel identifies as a lesbian, or a homosexual female. She did not know of any other employees on her team or at this location, generally, who identified as gay or as a member of the LGBTQ+ community, regardless of gender.

16.

Initially, Ms. McDaniel's coworkers were nice to her and tried to be helpful, and Ms. McDaniel made every effort to learn from her colleagues.

17.

However, Ms. McDaniel's experience eventually changed to the extent that she no longer felt safe in the workplace, as detailed more fully below.  By July 2024, Ms. McDaniel felt that she had no other option but to resign from her job.

18.

Initially, Ms. McDaniel understood certain workplace conduct to be more akin to "locker room talk."  For example, Ms. McDaniel's friend-coworker who helped her find the job with Defendant, played a prank on her by swapping the standard tire valve caps on her vehicle with a

gag version in the shape of penises. When co-workers saw the gag, Ms. McDaniel laughed with them about the prank.

19.

During this time, Ms. McDaniel witnessed the operation's manager place a magnetic decal on her supervisor's vehicle that read, "I love gay porn!" Again, Ms. McDaniel chuckled before returning to work.

20.

Shortly thereafter, however, it became clear to Ms. McDaniel that Defendant's workplace was hostile, permeating with conduct of a sexual nature that was often very explicit. Ms. McDaniel also observed her male coworkers and male supervisor routinely make hostile and abusive comments concerning females, in general, as well as members of the LGBTQ+ community.

21.

Ms. McDaniel and her team would routinely exchange text messages in a group chat, but the content generally had nothing to do with work and often include vulgar and offensive content, including jokes directed toward women and the LGBTQ+ community.

22.

Shortly into Ms. McDaniel's tenure, one coworker sent a text message with a picture appearing to be of peanuts boiling in a pot.  Another coworker responded, "[d]ang you have some big nuts."  Supervisor John Barber (hereinafter, "Barber") then chimed in using the common double entendre, "that's what she said."

23.

One week later, on a Sunday evening, when everyone was off of work, Mr. Barber responded to one of Ms. McDaniel's coworkers who mentioned his fish fry, criticizing the

5

employee for serving Bud Light, and saying the employee would have to wear a skirt if they consumed the beverage.

24.

Ms. McDaniel understood Mr. Barber's Bud Light comment to be an insensitive reference about the transgender community. That was because a major cultural controversy had arisen merely one month earlier when Bud Light featured a transgender woman in a social media marketing campaign, leading to a major boycott of the brand.

25.

Just over one week later in the same group text message chain, an employee told the group that he was about to "come" to a certain location, to which Mr. Barber responded, "[d]on't get it all over you."

26.

However, this sort of conduct was not limited to electronic communications; it was occurring in the workplace as well.

27.

In mid-June 2023, an unknown employee fashioned a length of wire into the shape of male genitalia, and the employee left the wire on the picnic table where most employees were known to eat on their lunch breaks.

28.

Several days later, Mr. Barber sent a message about how one of Defendant's other female employees was traveling to pick up a "load," and he used that term to suggest that another member of his team should have sexual intercourse with that female employee. Ms. McDaniel tried to express her offense to this comment by responding with a hand-over-face emoji.

29.

Around the same time, Mr. Barber, apparently trying to parody a game show, told another employee in the group text that he was the next contestant on "Let's see who's gonna get the shaft." That employee and the others in the group followed up with several apparent references to sexual intercourse between males.

30.

In July 2023, one of Defendant's employees circulated throughout Defendant's shop, showing every other employee, including Ms. McDaniel, a meme with an image of two horses aggressively putting their lips together, which the meme suggested was akin to how lesbians engaged in sexual intercourse.

31.

On July 20, 2023, Mr. Barber instructed his subordinates to move several cases of water because another one of Defendant's female employees was "weak." Mr. Barber explained further that he agreed to move the cases of water so that the female employee would not "bitch as much."

32.

Around the time that Ms. McDaniel completed her 90-day probationary period, McDaniel found that her coworkers were no longer acting warmly toward her, they no longer assisted McDaniel, and she could tell that some of her colleagues were not joking but actually harbored sexist or homophobic views and did not like McDaniel.

33.

By around August 2023, the workplace had become so toxic and stressful that Ms. McDaniel had to seek medical attention for her mental health. However, Ms. McDaniel tried to remain focused on doing her best at work.

34.

It was also around that time that Ms. McDaniel felt like she could no longer force laughter at her male coworker's vulgar and offensive comments and conduct.

35.

Mr. Barber apparently recognized how his conduct was being received by Ms. McDaniel as he told her around the time to let him know if anything was making McDaniel uncomfortable. This did not appear to be a serious offer as Mr. Barber laughed out loud immediately after making this statement.

36.

In an attempt to avoid some of this conduct, Ms. McDaniel stopped going to lunch with her coworkers and would instead eat lunch by herself. However, this only caused Ms. McDaniel's coworkers to make fun of her eating alone.

37.

Ms. McDaniel continued doing her best to avoid or ignore these comments and conduct, and she did not initially complain because she was very concerned that a complaint would lead to her losing her job.

38.

Not only did Mr. Barber engage in the aforementioned conduct with subordinates, he would do the same with his own supervisors.

39.

For example, in early September 2023, Mr. Barber was on a call telling his supervisor about a waste container that had been built by employees from scratch, saying to his manager that his subordinates may have used "female measurements" because some of the measurements were off.

Ms. McDaniel, who overheard Mr. Barber's side of this conversation, understood Barber to mean either that women were incapable of tasks like measuring, or a suggestion that men and women assign different measurements to male genitalia.

40.

Either way, Ms. McDaniel found Mr. Barber's measurement comment to be offensive and inappropriate for a workplace environment, especially having the gall to say the same to a member of upper management.

41.

On September 9, 2023, Mr. Barber announced to the group chat that he was "stuck with" one of Defendant female employees whom Barber then referred to as "Bitchhead."

42.

Around the same time, Mr. Barber said that another female employee should "shut her clam" because it already smelled bad enough on Jekyll Island. Mr. Barber's use of the term "clam" was an obvious reference to the female employee's vagina.

43.

Ms. McDaniel began to find that she was being treated differently than her male colleagues. For example, in September 2023, Ms. McDaniel observed Mr. Barber allowing a male member of the team, and the person whom McDaniel had been assigned to partner with, to literally take a nap for approximately 90 minutes immediately after clocking in, and Barber refused to reassign McDaniel to another partner who could actually help her learn the job. Mr. Barber also required McDaniel to change clothes when she was wearing a hooded sweatshirt that may have been outside of Defendant's dress code; yet, Barber would routinely overlook the male employees' hats, safety

glasses, and other dress code violations.  Unlike her colleagues, Ms. McDaniel was also required to provide documentation each time she was off work for medical reasons.

44.

By October 2023, the vulgar conduct had become far more extreme and offensive.

45.

On September 29, 2025, one of the male employees on the team sent a text message saying that "[c]ats are evil," which had a photograph attached of five cats who, because of their markings and the shadows in the photograph, appear to spell "N-I-G-G-E-R".

46.

On October 4, 2023, the same male employee sent the following photograph, which purports to be a listing for the sale of "corn dog holders," when in actuality, the items are adult toys:



47.

The next day, October 5, 2024, one male colleague sent a group text containing an image of three anal plugs that each had the head of a duck:



48.

Immediately following that text message, another male colleague forwarded the following screenshot of a social media post mocking gay women:



49.

After the text making fun of lesbians, a different male employee sent a photo appearing to be a basket of lollipops. However, in addition to that image of the container, the text included an image of a woman in a compromised position, inserting a lollipop into her own rectum, with an image of a hand-drawn face on her buttocks.

50.

On October 9, 2023, Mr. Barber sent the following photo to the group of his subordinate employees, purportedly of a "party whistle," but actually appearing to be an adult toy:



51.

In October 2023, Mr. Barber continued to unfairly target Ms. McDaniel. For example, Mr. Barber reprimanded Ms. McDaniel for leaving an assignment three-fourths completed at the end

of a shift, and Mr. Barber called a meeting to address this the following day with the entire team, but there were countless occasions Ms. McDaniel observed where Mr. Barber did not criticize her male colleagues for leaving work uncompleted, and several times Mr. Barber actually instructed male employees to do so. There were also several occasions when Ms. McDaniel was made to work at the same time that her male colleagues were not given any assignments and allowed to sit and use their personal phones.

52.

On November 7, 2023, Mr. Barber called out Ms. McDaniel for wearing tinted protective eyewear, which she required due to her vision, even though Barber was aware that there were several male employees wearing non-protective, non-prescription sunglasses at the same time.

53.

The same day, Mr. Barber announced to his employees that he would be instituting a new policy for how out-of-town assignments would be made, which was based on seniority. Ms. McDaniel believed that this policy specifically targeted her because it would mean she would never receive the higher paying assignments because she was the newest employee on the team.

54.

On November 8, 2023, Ms. McDaniel contacted a representative of Defendant's human resources department, Ellen Griffin, (hereinafter, "HR Rep. Griffin") to make an internal complaint about the harassment and discrimination that McDaniel had been subjected. Ms. McDaniel spoke with HR Rep. Griffin at length, and she provided a description of that the treatment for which she had been subjected by Mr. Barber and her other coworkers.

55.

On the same day, Mr. Barber showed several employees a photograph of a family at a Halloween party all dressed as members of the family of Alex Murdaugh, the disbarred South Carolina attorney who was convicted of murdering his wife and child in 2023. Mr. Barber then joked about how a member of the Murdaugh family allegedly murdered a gay male classmate, all because the Murdaugh family refused to accept and acknowledge their own son's sexual orientation.

56.

Two days after Ms. McDaniel spoke with HR Rep. Griffin, Mr. Barber announced that Griffin had sent a company-wide email requiring Barber and other managers to provide mandatory refresher training on sexual harassment to all employees.

57.

Mr. Barber, who appeared to be irritated by this directive, told employees, "I know most of you have heard all this shit many times, so it'll be quick."

58.

Mr. Barber proceeded to pull each welder aside for the one-on-one refresher training, but none of Mr. Barber's refresher "trainings" lasted more than a couple of minutes.

59.

Ms. McDaniel, who was within earshot of one of her coworker's refresher sessions, heard Mr. Barber say, "I'm not going to read all this shit over again for you, you know what it means; just don't sexually harass anyone."

14

60.

As November 2023 continued, Mr. Barber continued his criticisms of Ms. McDaniel, he would make her work when all others were on break, and he would avoid assigning Ms. McDaniel to the more lucrative out-of-town assignments.

61.

On November 17, 2023, Mr. Barber did assign Ms. McDaniel to an out-of-town job in Savannah.  But when he found out that it was Ms. McDaniel's last week of welding school and she would have to travel back and forth, he refused to provide a hotel room to McDaniel like all other employees, which also precluded McDaniel from receiving pay for travel or a per diem.

62.

Ms. McDaniel had not heard back from HR Rep. Griffin by November 17, 2023, so she sent a follow up email asking for an update and advising that McDaniel had also raised her concerns with another manager, Tony Lawrence.

63.

HR Rep. Griffin did not respond to Ms. McDaniel's November 17, 2023 email.

64.

On December 14, 2023, Ms. McDaniel discovered that the hood of her vehicle had been bashed in while parked on Defendant's property.  While Ms. McDaniel filed a complaint and Defendant said it investigated, Defendant refused to take any action to resolve this issue because Defendant said it does not have video surveillance in that parking lot.

65.

On December 20, 2023, Mr. Barber called out Ms. McDaniel in front of her co-workers, asking why Ms. McDaniel's back was "crooked."  When Ms. McDaniel explained that she has

scoliosis, he continued discussing the fact that he knew someone with the condition who had surgery.  Ms. McDaniel was uncomfortable with this conversation, especially since it was in front of other coworkers, so she tried to ignore it and continue working.  The following day, Mr. Barber approached another member of management to discuss his newfound "concerns" about whether Ms. McDaniel met the physical requirements of the job due to her condition.

66.

Ms. McDaniel approached manager Tony Lawrence on December 21, 2023, and complained about many of the incidents when she was harassed and treated differently than her colleagues.

67.

Ms. McDaniel also told Mr. Lawrence, "I feel like he's either homophobic or he cannot stand the fact that I'm a woman.  If y'all want me to be completely honest with you … [Barber's] standards vary from day-to-day… and 90% of them are pointed at me."

68.

Mr. Lawrence responded that he did not want McDaniel to feel like she was being subjected to a hostile work environment because of her gender or sexual orientation. Mr. Barber also assured Ms. McDaniel he would investigate.

69.

Despite Mr. Lawrence's assurances, it would still be another two months before Defendant took any action whatsoever toward Mr. Barber.

70.

Mr. Barber apparently learned about the complaints that Ms. McDaniel had made to Mr. Lawrence.  On December 22, 2023, Mr. Barber approached one of the male employees under his

supervision, Joe Gerstanbuth, accusing Gerstanbuth of subjecting Ms. McDaniel to a hostile work environment. Mr. Gerstanbuth later apologized to Ms. McDaniel directly, who confirmed that she had made no such complaint about him.

71.

At this point, it appeared to Ms. McDaniel that Mr. Barber was attempting to create division and animosity between McDaniel and her male coworkers.

72.

On December 26, 2023, several male employees apparently discovered a sex toy and personal lubricant on Defendant's premises. When Ms. McDaniel arrived, Mr. Barber was waving a large dildo in the air, and said directly to Ms. McDaniel, "[h]ey Megan, did you drop something? Ain't this what y'all use? Ain't this what lesbians use ?"

73.

Mr. Barber then continued the conversation about the adult toy in the group chat:



74.

Other coworkers responded to Mr. Barber's message, including one message containing a photo and text discussing "anal lube."

75.

In addition to sending these texts, Mr. Barber and others continued to reference the adult toy for the remainder of the day, and it was discovered in various locations throughout the workplace.

76.

Ms. McDaniel perceived this conduct, especially that directed specifically toward her, to be harassment based on McDaniel's sexual orientation, either because a gay woman would not generally be interested in male genitalia or because of the stereotype that lesbians are frequent users of these types of adult toys.

77.

Moreover, the use of such adult toys is a known device for people expressing anti-female views and a tool to both intimidate or threaten women, especially in disrupting their workplaces. This is similar to the several instances in which WNBA games were disrupted during the 2025 season when several spectators threw dildos onto the basketball court.

78.

The following day, Ms. McDaniel reported the incident involving the adult toy to Mr. Lawrence via email, and especially since McDaniel had still not received a response, she sent a follow up email to HR Rep. Griffin.

79.

Apparently, three of Ms. McDaniel's male colleagues had recently met with Mr. Lawrence to discuss their concerns about Mr. Barber. While Ms. McDaniel had apparently been invited to attend this meeting to share her own concerns, no one made her aware of the meeting until after the fact.

80.

On January 2, 2024, HR Rep. Griffin responded to Ms. McDaniel's prior emails, first stating that she had not received McDaniel's prior email because it may have filtered into her junk folder, and asking whether McDaniel had availability to speak the following day.

81.

Ms. McDaniel responded the following day confirming that she could be available to take HR Rep. Griffin's call at any time, and McDaniel noted that she had been discussing her concerns with Mr. Lawrence as well.

82.

Ms. McDaniel spoke with HR Rep. Griffin for approximately 45 minutes later that day to discuss her ongoing concerns about harassment and retaliation.

83.

On January 5, 2024, Ms. McDaniel was awaiting a one-on-one interview with Defendant's upper management about the ongoing harassment, particularly the December 26th incident, when McDaniel observed HR Rep. Griffin recognizing notices that were posted on the wall. It was only at that point when Ms. McDaniel realized that Defendant has an employee helpline that can be used to report discrimination and harassment.

84.

Prior to that moment, Ms. McDaniel had not been told about Defendant's employee helpline or its related reporting website, including during her conversations with HR Rep. Griffin or in the sexual harassment training provided by Mr. Barber.

85.

Defendant still failed to take any action to address Ms. Barber and his conduct.

86.

It was around this time that Ms. McDaniel began to routinely experience panic attacks due to what she was experiencing at work.

87.

On January 15, 2024, Mr. Lawrence told Ms. McDaniel that he was going to pull Mr. Barber away one day in order to have a "heart-to-heart" with him about his conduct, which Mr. Lawrence said he hoped would help improve the poor working environment.

88.

It was not until January 24, 2024, when Mr. Barber told Ms. McDaniel and her coworkers that he was being pulled away for a meeting the following day with HR Rep. Griffin, Mr. Lawrence, and General Manager Bart Keller (hereinafter, "GM Keller")  while the rest of Mr. Barber's team was on a job in Vidalia.

89.

On February 7, 2024, GM Keller approached Ms. McDaniel, without prior warning, to discuss the incidents of harassment that she had reported, including the incident with the adult toy on December 26th.

90.

Ms. McDaniel spoke with HR Rep. Griffin once again on February 13, 2024, and Ms. McDaniel agreed to provide any additional documentation or information that she could.  HR Rep. Griffin thanked Ms. McDaniel for her time and help collecting that information.

91.

Mr. Barber also delivered a 2023 Annual Performance Review to Ms. McDaniel on February 13, 2024.  Unlike all of her male colleagues, Ms. McDaniel was rated as "needs improvement" and a merit pay increase was denied.

92.

The 2023 Annual Review vaguely and unfairly criticizes various aspects of Ms. McDaniel's performance, and the only strength identified – being attentive to paperwork – was something not at all required by Ms. McDaniel's job.

93.

Ms. McDaniel could neither have been attentive nor inattentive to paperwork – paperwork was not a part of her job as a welder.

94.

On the same day, HR Rep. Griffin met with Ms. McDaniel's entire team, both as a group and individually, and asked additional questions about the December 26th incident.  When the employees returned to the shop, Mr. Barber told his subordinates that he needed to go take care of some business, but that he hoped he would be back at work the following week.

95.

Apparently, February 13, 2024 was the first time Defendant had taken any tangible action against Mr. Barber for any of the types of conduct for which Ms. McDaniel had complained, and it was at that point that Defendant suspended Mr. Barber's employment.

96.

On February 19, 2024, Mr. Lawrence approached Ms. McDaniel, and he explained that her results on the Annual Performance Review were because Ms. McDaniel had received one "coaching" from Mr. Barber due to being late to work.

97.

In response, Ms. McDaniel noted that she had not even incurred enough tardies to qualify for a "write up," much less, to have her merit increase denied. She also addressed the fact that she was aware of one of her male colleagues who had to have two coaching sessions for incidents that cost Defendant several thousand dollars, including one who erroneously cut a wire lead and another who shattered the door of a skid steer, yet both still received the merit increase.

98.

Ms. Lawrence told Ms. McDaniel that he would look further into this issue.

99.

On February 20, 2024, Ms. McDaniel followed up with HR Rep. Griffin to provide her disagreement with the Annual Performance Review, advising that McDaniel believed it was retaliatory, and asking that the situation be escalated to GM Keller. HR Rep. Griffin acknowledged Ms. McDaniel's message and said she would speak with Mr. Lawrence and GM Keller.

100.

Several days after Mr. Barber was eventually suspended, his subordinates would learn that he had been terminated. However, that was when Ms. McDaniel began being harassed by two of her male colleagues, Willie Beverly and Joe Gerstanbuth. One of the individuals refused to speak or interact with Ms. McDaniel, and he would loudly drop objects when in close proximity to Ms. McDaniel. At the same time, the other individual was tracking Ms. McDaniel on social media, was

watching her at work, and he was once caught trying to take a picture using his phone of McDaniel while at work.  It was not only apparent that this coworker was trying to get Ms. McDaniel fired, he had actually admitted the same several weeks earlier to another employee.

101.

Mr. Barber was apparently still in active communication with the same two former subordinate employees, and he told them after his termination "[t]o be prepared that all the men are going to get fired in that shop."

102.

The following month, one of those two individuals, Willie Beverly, intentionally clipped the line for the windshield wiper hose, and pointed the severed line toward the face of the person who would later operate the equipment.  This was intended to be a prank where liquid would squirt into the face of the next person who would operate the equipment.

103.

Mr. Beverly was aware that this equipment, a skid steer, was going to be used next by Ms. McDaniel.

104.

Ms. McDaniel was also assigned tasks that were not expected of the male employees, like when McDaniel was asked to collect her coworker's clothing sizes before ordering new protective gear.

105.

Immediately before Mr. Lawrence asked Ms. McDaniel to order the gear, he advised her that McDaniel should have absolutely received a "meets expectations" on her Annual Performance

23

Review, and that the prior decision was reversed and she would be receiving the merit increase and any back pay for the increase she had yet to receive.

106.

Ms. McDaniel continued to be harassed by the same two male colleagues, Beverly and Gerstanbuth.  Ms. McDaniel reported this to the interim supervisor, who apparently approached both men, causing their harassment toward Ms. McDaniel only to increase.

107.

For example, on one occasion, one of the men sent several text messages to the group about how he had killed a possum, and he included several very graphic and gory pictures of the animal's demise.  Ms. McDaniel felt that these messages were sent in an effort to intimidate McDaniel.

108.

Around the same time, on March 24, 2024, the other employee, Mr. Beverly, spliced a torch hose, and then threw it across the room toward Ms. McDaniel, landing merely a foot away from her.

109.

Despite Ms. McDaniel's complaints, this type of conduct continued into the following month, including one incident where Mr. Beverly caused sparks from his welding equipment to be flung toward and on Ms. McDaniel, burning her in the process.  This was evidently intentional, as Ms. McDaniel's other harasser observed the entire incident and could be heard laughing after Ms. McDaniel reacted to the barrage of sparks.

110.

At this point, Ms. McDaniel no longer felt safe in the workplace, and she made her objections and concerns known to management the following day.  She also advised management

that she was considering requesting a short leave of absence as a result of all of the treatment she experienced and resultant stress.

111.

Mr. Beverly and Mr. Gerstanbuth, both of whom Defendant was aware had been involved in the December 26, 2023 incident, were finally terminated along with one other employee on April 29, 2024.

112.

However, Ms. McDaniel continued to be targeted in the workplace, especially after Defendant became aware that Ms. McDaniel had filed a Charge of Discrimination with the Equal Employment Opportunity Commission.

113.

In mid-May 2024, Mr. Lawrence approached Ms. McDaniel for purportedly failing to fill out an employee satisfaction survey. Ms. McDaniel tried to explain that no one had told her about the survey, and until that point, she had not been aware. Still, on May 31, 2024, Mr. Lawrence issued a write-up to Ms. McDaniel for failing to complete the same, and that document stated that Ms. McDaniel could be terminated immediately for any additional violations.

114.

Ms. McDaniel reported this write up to the Director of Defendant's Human Resources Department in early June 2024. However, Ms. McDaniel did not hear anything after her conversation with the Director, requiring her to follow up on June 13, 2024.

115.

By July 2024, it was apparent that Defendant had not and was continuing not to take Ms. McDaniel's concerns seriously. Moreover, the treatment that she received throughout the entirety of her employment had a significant impact on Ms. McDaniel's mental health.

116.

As a result, Ms. McDaniel felt that she had no other choice but to resign from her employment with Defendant on July 22, 2024.

117.

The harassment did not stop when Ms. McDaniel resigned, including on July 30, 2024, when Ms. McDaniel received a telephone call from an unknown number, and the person on the other end told Ms. McDaniel when she answered, "HAHA! Bitch, you got fired."

Procedural Background

118.

Ms. McDaniel submitted her Charge of Discrimination to the Equal Employment Opportunity Commission on March 25, 2024.  In her Charge of Discrimination, Ms. McDaniel alleged that she had been subjected to a hostile work environment due to her sex, including sexual orientation, and further subjected to retaliation in violation of the Title VII of the Civil Rights Act. Given Defendant's multiple locations, the EEOC assigned Ms. McDaniel two Charge Numbers, 415-2024-00568 and 410-2024-06490.

119.

Defendant had notice of Ms. McDaniel's Charge of Discrimination, and participated in the proceedings before the EEOC, and was represented by counsel at the time.

120.

On August 15, 2025, the EEOC issued its Notice of Right to Sue, issued upon Ms. McDaniel's request, and Ms. McDaniel received it sometime thereafter.

121.

Ms. McDaniel has exhausted her administrative remedies as to her Charge of Discrimination, and she is filing the instant action within ninety days of the EEOC's issuance and her receipt of the Notice of Right to Sue.

## COUNT I:
## HARASSMENT AND HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

122.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 121, as if the same were set forth herein.

123.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against or harass any of its employees on the basis of race or sex.  *See* 42 U.S.C. § 2000e-2(a).

124.

Title VII's prohibition on discrimination based on sex includes an employer who discriminates against an individual because they are gay. *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020).

125.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

126.

Plaintiff is a member of a protected class in that she is female and identifies as homosexual or gay.

127.

As alleged herein, starting as early as May 2023 and continuing throughout her separation, Defendant subjected Plaintiff to unwelcome conduct in the form of sexually inappropriate, often extremely vulgar, comments and images made both during in-person workplace interactions and text messages.

128.

As alleged herein, starting as early as May 2023 and continuing throughout her separation, Defendant subjected Plaintiff to unwelcome conduct in the form of derogatory and offensive comments about women, generally, including routinely referring to female employees of Defendant using epithets and offensive names.

129.

As alleged herein, starting as early as May 2023 and continuing throughout her separation, Defendant subjected Plaintiff to unwelcome conduct in the form of derogatory and offensive comments about homosexual, or gay, women and members of the LGBTQ+ community generally.

130.

As alleged herein, starting as early as May 2023 and continuing throughout her separation, Defendant subjected Plaintiff to unwelcome conduct in the form of derogatory and offensive comments, specifically directed toward Plaintiff, because Plaintiff is female.

131.

As alleged herein, starting as early as May 2023 and continuing throughout her separation, Defendant subjected Plaintiff to unwelcome conduct in the form of derogatory and offensive comments, specifically directed toward Plaintiff, because Plaintiff identifies as homosexual or gay.

132.

As alleged herein, said conduct was severe and pervasive enough to create a hostile work environment that a reasonable person would consider intimidating, hostile, and abusive.

133.

Plaintiff personally found such conduct and words extremely offensive.

134.

Plaintiff was subjected to such conduct and words on a routine and nearly-daily basis during her employment with Defendant.

135.

Plaintiff reported the harassment that she was subjected by her coworkers to Plaintiff's supervisors and representatives of Defendant's human resources department.

136.

Plaintiff reported the harassment that she was subjected by her manager to her manager's supervisors and representatives of Defendant's human resources department.

137.

Further, Defendant failed to address Plaintiff's complaints about her supervisor's conduct until more than three months had elapsed from Plaintiff's initial complaint.

138.

As a direct result of Defendant's delay or failure to address the conduct of Plaintiff's supervisor, the treatment that Plaintiff experienced continued and worsened.

139.

Defendant also failed to address Plaintiff's complaints about her non-supervisory coworkers' conduct until more than five months had elapsed from Plaintiff's initial complaints and more than four months after Defendant became aware of both individual's conduct from December 26, 2023 that purportedly resulted in their termination.

140.

As a direct result of Defendant's delay or failure to address the conduct of Plaintiff's coworkers, the treatment that Plaintiff experienced continued and worsened.

141.

Defendant is liable for the conduct of its non-supervisory employees as Defendant knew and should have known about the harassment of Plaintiff by its non-supervisory employees, as a result of members of management observing some of the conduct and because of internal complaints that Plaintiff made, and Defendant failed to take prompt and appropriate corrective measures.

142.

Defendant is liable for the conduct of its supervisory employees as Defendant failed to take any reasonable care to prevent or promptly correct any harassing conduct, and Defendant did not provide Plaintiff with any preventative or corrective opportunities for which Plaintiff could have taken advantage.

143.

The conduct alleged herein was directly connected to Plaintiff's sex, sexual orientation, and notions of stereotyping based on sex.

144.

Defendant is unable to articulate a legitimate, nondiscriminatory reason for the alleged conduct.

145.

In the alternative to Plaintiff's claim for retaliation, as alleged below, the harassment and hostile work environment for which Plaintiff was subjected had caused Plaintiff's working conditions to become so intolerable by July 2024 that Plaintiff, like any reasonable person in Plaintiff's position, felt compelled to resign from her employment.

146.

As a result, Defendant is liable for constructively terminating Plaintiff's employment.

147.

Plaintiff has been injured by Defendant's harassment and hostile work environment, and is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of no less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**RETALIATION**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

148.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 121, as if the same were set forth herein.

149.

Under Title VII of the Civil Right Act, it is unlawful for an employer to retaliate against an employee because they have opposed any unlawful employment practice. See 42 U.S.C. § 2000e-3(a). Similarly, it is unlawful to retaliate against an employee who has made a charge, testified, assisted, or participated in an investigation or proceeding. *Id*.

150.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

151.

Plaintiff engaged in protected activities when she opposed the harassment and hostile work environment for which Plaintiff was subjected based on sex and sexual orientation when Plaintiff made internal complaints to members of management and representatives of human resources on numerous occasions, including on November 8, 2023, as alleged herein.

152.

Plaintiff was qualified for her position, and she was otherwise entitled to the compensation and benefits that she received, and should have received, during her employment.

153.

Beginning several months into Plaintiff's employment, Plaintiff began expressing her opposition to conduct and comments of her direct supervisor and coworkers that Plaintiff believed was creating a hostile work environment based on sex and sexual orientation.

154.

As alleged herein, the hostile workplace conduct of which Plaintiff was subjected only escalated in severity and frequency after Plaintiff began opposing such conduct several months into Plaintiff's employment.

155.

After Plaintiff began expressing her opposition to such workplace conduct, Plaintiff found that her direct supervisor began targeting Plaintiff and holding her to much higher and stricter standards than Plaintiff's coworkers who had not expressed such opposition.

156.

Additionally, on or around November 7, 2023, Plaintiff's direct supervisor instituted a new policy for the more-lucrative out-of-town assignments would be made based on seniority, specifically because this would mean Plaintiff would be much less likely than the other members of her team to be given such an assignment.

157.

Beginning on or around November 8, 2023, Plaintiff began making internal complaints to Defendant's human resources representatives and other members of upper management about the harassment for which Plaintiff's supervisor and coworkers had been subjecting Plaintiff.

158.

Plaintiff's supervisor likely became aware that Plaintiff had complained of sexual harassment within merely a few days of Plaintiff's complaint.

159.

After Plaintiff's supervisor likely became aware of Plaintiff's complaint, he increased his criticisms of Plaintiff and would even make Plaintiff work alone when the remainder of the team was on break.

160.

After Plaintiff's supervisor likely became aware of Plaintiff's complaint, he refused to grant Plaintiff certain benefits like for traveling to out-of-town assignments like Plaintiff's coworkers.

161.

Upon information and belief, after Plaintiff's supervisor or coworkers had become aware of Plaintiff's internal complaint of sexual harassment, Plaintiff's supervisor or coworkers caused Plaintiff's vehicle to be vandalized.

162.

When Plaintiff reported the vandalization of her vehicle to Defendant, Defendant refused to take any reasonable efforts to investigate or remedy the damage.

163.

On December 20, 2023, after Plaintiff's supervisor was likely aware of Plaintiff's complaints, he began teasing Plaintiff for her medical condition, and Plaintiff's supervisor then used that medical condition to suggest that Plaintiff should be terminated because she was not physically capable of performing the job, despite having no evidence to support such belief.

164.

Plaintiff made an additional internal complaint about the ongoing harassment that was largely being caused by Plaintiff's supervisor to a member of upper management on December 21, 2023.

165.

Plaintiff's supervisor became aware of Plaintiff's complaint the following day  as the supervisor tried to convince one of his subordinates that Plaintiff's complaint had instead been about him.  Upon information and belief, Plaintiff's supervisor was attempting to create animosity between Plaintiff and her colleagues.

166.

The hostile work environment only escalated after Plaintiff's supervisor became aware of Plaintiff's most recent complaint, including when Plaintiff's supervisor and several coworkers used an adult toy to harass and intimidate Plaintiff on December 26, 2023.

167.

Despite Plaintiff's repeated internal complaints, Defendant refused to take reasonable measures to address the conduct, and there were stretches of time when Defendant's representatives failed or refused to respond to Plaintiff's inquiries.

168.

After Plaintiff's supervisor became aware of Plaintiff's complaints about the ongoing harassment, the manager gave Plaintiff a poor rating on Plaintiff's 2023 Annual Performance Review, to the extent that a merit pay increase was denied, which was delivered to Plaintiff on February 13, 2024.  This rating had been specifically approved by Plaintiff's second-level supervisor, who was well aware of Plaintiff's complaints at the time of his approval.

169.

Defendant finally took action against the manager responsible for much of the harassment when Defendant suspended his employment and then terminated him in February 2024.

170.

However, Defendant still failed and refused to take any action against any of Plaintiff's other coworkers who had been responsible for the offensive conduct.

171.

The terminated supervisor then warned his former subordinates by suggesting that Plaintiff was going to cause them to be fired as well.

172.

Subsequently, Plaintiff's coworkers increased the severity of the harassment, including through the use of pranks and by throwing objects toward Plaintiff and using tools and equipment around her in an obviously unsafe manner.

173.

This conduct, along with text messages involving the killing of an animal and a phone call that Plaintiff received after she eventually resigned, were intended to physically threaten and intimidate Plaintiff.

174.

Additionally, after her complaints, Plaintiff also began receiving assignments stereotypically considered "women's work," such as collecting sizes and ordering gear for her team, that employees who had not made similar complaints were never expected to do.

175.

Plaintiff was also subjected to unfair disciplinary actions, like when Plaintiff received a write up, threatening her with termination, for failing to complete a task that Plaintiff had never been advised to perform.

176.

Defendant failed and refused to take reasonable actions against Plaintiff's coworkers for whom Plaintiff had complained about until they were terminated on or around April 29, 2023.

177.

Because Plaintiff felt unsafe in the workplace and that she had done all that she could to try to keep her position, Plaintiff ultimately felt as though she had no other choice but to resign fromm her position on or around July 22, 2024 due to the discriminatory and retaliatory harassment.

178.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the aforementioned conduct based on Plaintiff's participation in protected activities.

179.

Plaintiff has been injured by Defendant's retaliation, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of no less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Megan McDaniel respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant Republic Services of Georgia LP, and that Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff on Count I for subjecting Plaintiff to harassment and a hostile work environment based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

4)      That judgment be awarded for and in favor of Plaintiff on Count II for retaliation and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

5)      For such other relief as this Court shall seem just and proper.

Respectfully submitted, this 10th day of November, 2025.

/s/ Tamara N. Holder

TAMARA N. HOLDER
*To seek admission pro hac vice*
Illinois Bar No. IL 6284888

The Law Firm of Tamra N. Holder, LLC
917 W. Washington Blvd., Ste. 222
Chicago, Illinois 60607
Phone: 312-404-9000
tamara@tamaraholder.com

KENNETH E. BARTON III
Georgia Bar No. 301171

*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
Telephone: (478) 841-9007
Facsimile: (478) 841-9002
keb@cooperbarton.com